UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 07-80051-Cr-Hurley/Vitunac (s)(s)(s)

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

JULIEN GARCON,

          Defendant.

_____/

FILED by _____ D.C.

JAN 1 5 2008

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## REPORT & RECOMMENDATION

THIS CAUSE is before the Court on general Order of Reference from United States District Judge Daniel T.K. Hurley for disposition of all pending pretrial criminal motions. Pending before the Court is the Defendant's Motion to Suppress and Otherwise Exclude From Evidence Eyewitness Identification (DE 107), filed November 26, 2007. The Court held an evidentiary hearing on December 13, 2007. At the conclusion of the hearing the Court ordered the parties to file written briefs on the issues raised by the Court. The Government filed its Brief (DE 132), on January 4, 2008. The Defendant filed his Brief (DE 133), on January 7, 2008. This matter is now ripe for review.

### Backgound

The Defendant is charged by superceding indictment (DE 65) with the following: count 1 - knowingly and intentionally manufacturing "crack' cocaine, of at least 5 grams, in violation of 21 U.S.C. § § 841(a)(1) and 841(b)(1)(B); count 2 - possession with intent to distribute "crack" cocaine, of at least 5 grams, in violation of 21 U.S.C. § § 841(a)(1) and 841(b)(1)(B); count 3 - possession with intent to distribute a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § § 841(a)(1) and 841(b)(1)(C); count 4 -

possession of a firearm, by a convicted felon, in violation of 18 U.S.C. § § 922(g)(1) and 924(e); and count 5 - possession of one or more rounds of ammunition, by a convicted felon, in violation of 18 U.S.C. § § 922(g)(1) and 924(e).

On November 8, 2007 and November 19, 2007, the Court held evidentiary hearings on Defendant's Motion to Suppress (DE 90) physical evidence discovered by law enforcement during three separate searches. One search challenged by the Defendant is the December 12, 2005 search by law enforcement, of 1663 Brandywine Road, Royal St. George Apartments, Apartment 5213, West Palm Beach ("Apartment 5213").

The assistant manager of the Royal St. George apartment complex, Nicole Stevens, was called as a witness by the defense at the November 8, 2007 suppression hearing. Stevens testified that in her capacity as a leasing agent with the Royal St. George apartment complex, she rented Apartment 5213 to a woman named Shari Morant. (DE 102:68). Morant requested that Stevens release the keys to Apartment 5213 to her "brother". (DE 102:70). Stevens testified that she released the keys, as instructed by Morant, on March 31, 2005, to an individual purporting to be Morant's brother.[1] Stevens testified that she never saw Morant again. Instead, the man who picked up the keys, who Stevens identified as the Defendant, came into the office to pay the rent with a money order. Stevens stated that "between April 1 and December [2005] the Defendant came in [to the management office] to pay the rent nine times."(DE 101:78). Stevens further testified that she gave a garage door opener and a gate pass to the Defendant. Stevens testified that she saw the Defendant in the apartment complex, either driving his car, or coming and going from his vehicle, but, never saw the tenant

---

[1]  Steven stated that whoever picked up Morant's keys must have shown her identification before she released the keys.

2

of record, Shari Morant. Stevens made the following in-court identification of the Defendant.

| Mr. Schumacher: | Okay. So this other individual that you had seen come in and going from the apartment, had you ever seen him before that? |
| Nicole Stevens: | I also -- he would pay the rent every month, so that was another question I had or concern that came up, why was he always paying the rent every month. |
| Mr. Schumacher: | Okay. Do you see that person as you look around the courtroom today? |
| Nicole Stevens: | Yes. |
| Mr. Schumacher: | And can you point him out and identify what he is wearing? |
| Nicole Stevens: | Right there in the blue and white. |

(DE 102:72). The Court thereafter noted for the record that the witness had made an in-court identification of the Defendant.

Stevens testified that sometime after the December 12, 2005 search of Apartment 5213, she identified the Defendant from a photographic lineup presented to her by law enforcement.

| Mr. Schumacher: | Were you ever asked to identify Mr. Garcon who you've now identified by Mr. Garcon [sic] by law enforcement? |
| Nicole Stevens: | Yes. |
| Mr. Schumacher: | And how did they do that? |
| Nicole Stevens: | With a picture lineup. |
| Mr. Schumacher: | How many times were you shown such a lineup? |
| Nicole Stevens: | Two times. |
| Mr. Schumacher: | Okay. What happened in the first attempt? |

3

|                   | Were you able to identify someone?                                                     |
|-------------------|----------------------------------------------------------------------------------------|
| Nicole Stevens:   | I was not.                                                                              |
| Mr. Schumacher:   | Okay. Do you know today whether or not Mr. Garcon was actually in the first lineup?     |
| Nicole Stevens:   | I do.                                                                                   |
| Mr. Schumacher:   | Okay. And how do you know that?                                                         |
| Nicole Stevens:   | I was told by the agent.                                                                |
| Mr. Schumacher:   | When were you told that by the agents?                                                  |
| Nicole Stevens:   | When they came out about – the same day and brought another lineup.                    |
| Mr. Schumacher:   | Okay. So they showed you a lineup of how many people?                                   |
| Nicole Stevens:   | Six.                                                                                    |
| Mr. Schumacher:   | And then they come out later that day; is that right?                                   |
| The Court:        | Don't lead.                                                                             |
| Mr. Schumacher:   | I'm sorry. They come out – do they come out a second time that day?                     |
| Nicole Stevens:   | They do.                                                                                |
| Mr. Schumacher:   | Did they show you anything?                                                             |
| The Court:        | Don't lead.                                                                             |
| Mr. Schumacher:   | What did they do when they came out?                                                    |
| Nicole Stevens:   | They showed me another six-picture lineup.                                              |
| Mr. Schumacher:   | Was - were any of the people in the first lineup in the second lineup?                  |
| Nicole Stevens:   | Yes.                                                                                    |
| Mr. Schumacher:   | How many people were in the same lineup?                                                |

4

Nicole Stevens:      One person was the same in each.

(DE 102:111-112).

Stevens out-of-court identification of the Defendant from a photographic lineup and her in-court identification of the Defendant are the subject of Defendant's instant Motion.

### Defendant's Written Motion and Supplemental Brief

The Defendant moves the Court to suppress Nicole Stevens' identification testimony contending that the identification procedure used by the WPBPD was "unduly suggestive" and unreliable, thereby violating the Defendant's constitutional right to due process. Defendant's Motion seeks to suppress: (1) Stevens out-of-court identification of the Defendant from a photographic lineup; and (2) Stevens in-court identification of the Defendant made during the motion hearings or at the time of trial.

In his Motion, Defendant argues that the out-of-court identification made by Stevens from a photographic lineup presented to Stevens by the police was "unduly suggestive" because: (1) Stevens failed to identify the Defendant from an initial photographic lineup presented to her by the police; (2) "[a]n hour later, the police then repeated the photographic lineup . . . by showing the witness [Stevens] a second set of new individual photos" where the "only individual repeated" in the second array was the Defendant; and (3) Stevens noticed at the time of the identification that the Defendant's photo was "the only photo duplicated in the two lineups."

Defendant contends that Stevens identification was unreliable under the totality of circumstances. In support, Defendant alleges that: (1) Stevens' description of the individual she saw in the apartment complex was insufficient because it contained only three details - that the individual was "5'6" to 5'8", dark complexion and stocky"; (2) Stevens did not approach the individual "when she had seen him" in the complex; and (3) Stevens had not

5

engaged the individual in conversation when he came into the management office to pay rent.

The Government's Written Brief [2]

The Government maintains that "even assuming" that law enforcement presented two photographic lineups to Stevens, the out-of-court identification of the Defendant by Stevens does not offend the Defendant's constitutional right to due process because the procedure used was "not unduly suggestive" and Stevens had an "independent basis" for identifying the Defendant. The Government argues that Stevens' out-of-court identification and in-court identification of the Defendant are reliable under the totality of circumstances and should not be excluded. The Government contends that as a threshold issue, the Court "needs to decide" whether Stevens was presented one or two photographic lineups. [3]

Alternatively, the Government argues that if Stevens was presented two photographic lineups, at different times, the photographic lineups themselves were not unduly suggestive because: (1) there is no evidence that the "same" photograph of the Defendant was contained in both photographic lineups; (2) there is nothing about the "second" photographic lineup that causes the Defendant to stand out from the others depicted; (3) no improper identification procedures were used by the officers - they did not direct Stevens' attention to the Defendant's photo, or "otherwise single out" the Defendant's photo; and (4) the identification procedure did not create a substantial likelihood of misidentification.

Furthermore, the Government argues that even if the identification procedure was "unduly suggestive" Stevens identification of the Defendant is reliable under the totality of

---

[2]    The Government did not file a Response to Defendant's Motion.   The Government's written brief was filed pursuant to the Court's December 13, 2007 Order.

[3] The Government maintains that Stevens and the law enforcement agents involved are not "knowingly providing false testimony" regarding the number of photographic lineups, but rather, there exists a "mistake of fact."

6

circumstances, and therefore, Defendant's Motion to Suppress should be denied.

December 13, 2007 Evidentiary Hearing

Agent Richard A. Birch

Agent Birch is a law enforcement veteran having served 12 years with the WPBPD and two years with the City of Lake Worth Police Department. Birch testified as to the number of photographic lineups presented to Stevens, the procedures used during the identification process, and the circumstances attendant to Stevens' identification of the Defendant from the photographic lineup.

Birch testified that on December 14, 2005, he accompanied Agent Van Reeth "to go show a photo lineup to a Witness" - that witness is Nicole Stevens.

> Agent Birch:     Agent Van Reeth asked Ms. Stevens, basically, explained to her he was going to show her a photo spread which contained six pictures and asked her to look at each picture individually and take her time to see if she recognized anybody, in particular, the person she believed lived at the apartment who was paying the rent on a monthly basis. And at one point she had given the keys to this person who she believed was the brother of the tenant.

> Mr. Schumacher:  Now, after Agent Van Reeth gave that statement to Nicole Stevens, was the photo line up that's been introduced as Government's Exhibit 9(a)[4] then presented?

> Agent Birch:     Yes.

> Mr. Schumacher:  What did Nicole Stevens do when it was presented to her?

> Agent Birch:     She immediately pointed to the picture, which is the top row center picture.

---

[4] Government's Exhibit 9(a) is a photographic lineup. It contains 6 color photographs of African-American males of approximately the same age and build.

| Mr. Schumacher: | And did Nicole Stevens write her name on the picture as well as date, and provide the time? |
|---|---|
| Agent Birch: | Yes, she did. |
| | . |
| | . |
| | . |
| Mr. Schumacher: | How quickly did Nicole Stevens point to the picture of the Defendant? |
| Agent Birch: | Immediately. |

(DE 128:13).

Birch testified that Government's Exhibit 9(a) was the "only" photographic lineup presented to Stevens. Birch stated that if "someone else" from law enforcement had shown Stevens a photographic lineup, as the co-case agent, he would have known about it. Birch testified that Stevens was not informed, prior to viewing the photographic lineup, that a photo of the suspect was contained within the array.

Detective David Lefont

Detective Lefont is a veteran police officer having served with the WPBPD since 1991. Lefont earned a bachelor of arts degree, with a major in business management, from Palm Beach Atlantic College. He is currently assigned to the Crimes Against Children Unit. Lefont's duties at WPBPD include preparing photographic lineups. Lefont testified that "most detectives know how to do a photo lineup." Lefont stated that on December 14, 2005, Van Reeth requested that he prepare a photographic lineup. Van Reeth provided him with the "candidate's name" [the Defendant]. Because there was no booking photo of the candidate, Lefont "pulled up the DAVID photo."[5] The first image generated by DAVID is "the most recent

---

[5]  Lefont explained that DAVID is the name of a computerized database of the Department of Highway Safety and Motor Vehicles, Florida Department of Highway Safety. The DAVID database maintains, typically in digital format, driver's license photographs and other information.

picture" contained in the DAVID system of that individual. Lefont used that picture [the first image generated - the most recent photo] of the candidate [the Defendant] to prepare the photographic lineup for Van Reeth. (DE 128:43). Lefont stated that he cropped the Defendant's DAVID photograph to eliminate a long gold chain. Lefont testified that the objective in preparing a photo array is to have "all the candidates appear to be the same: facial characteristics, physical characteristics."   Lefont testified that he saved the photographic lineup he created for Van Reeth on December 14, 2005, to a file on his computer, and it is the only one "that I can remember" doing for Van Reeth.

### Nicole Marie Talerico

Ms. Talerico, a crime scene analyst with the WPBPD testified for the Government. Talerico has been with WPBPD for three years and her duties include "backgrounds, lineups and flowcharts." Talerico testified that she prepared Government's Exhibit 11. Talerico stated that Government's Exhibit 11 is a "screen shot" from Lefont's computer of the files that were used for the photographic lineup that Lefont created for Van Reeth. Talerico testified that she found only one (1) photographic lineup file in Lefont's computer.   Talerico acknowledged that there would be "no indicia" of a photographic  lineup file, if someone created one and then did not save it to a file in his computer.

### Nicole Stevens

Nicole Stevens testified that sometime after the December 12, 2005 search of Apartment 5213, Agents Birch and Van Reeth requested that she look at a photographic lineup. Stevens stated that Birch and Van Reeth "came out" to the apartment complex management office to show her a photographic lineup.  Birch did all the talking. Stevens stated that Birch asked her to "point out anyone who I thought was the occupant of the apartment." (DE 128:78). Stevens testified that Birch also told her "what you always say

9

before you get shown a lineup. I can't remember the wording of it, but . . . ." Id.

| | |
|---|---|
| Mr. Schumacher: | Had you ever been shown a photographic lineup before? |
| Nicole Stevens: | No. |
| Mr. Schumacher: | How did you find that? What were you feeling when you were being shown that? |
| Nicole Stevens: | I was just trying to see if I could identify anyone. |
| Mr. Schumacher: | Okay. Were you kind of bored with it, excited about it? |
| Nicole Stevens: | It didn't really matter. I was just trying to help out. |
| Mr. Schumacher: | Was there anything else discussed about who you might be shown prior to seeing them? |
| Nicole Stevens: | No. I was just supposed to pick out who I thought was the occupant. <br> . <br> . <br> . |
| Mr. Schumacher: | Did you have any kind of understanding about whether or not you were supposed to pick somebody out or not? |
| Nicole Stevens: | I was just suppose [sic] – if I could recognize the person that I saw, then I was supposed to point him out. <br> . <br> . <br> . |
| Mr. Schumacher: | Did you give it your full attention? |
| Nicole Stevens: | Absolutely. |
| Mr. Schumacher: | Were you able to pick anybody out at that time? |
| Nicole Stevens: | At the first lineup I was not able to. |
| Mr. Schumacher: | Could you tell us a little bit about what the |

actual lineup looked like?

Nicole Stevens: It was six pictures just on a piece of paper, had six different people, I'm assuming, on it. I don't know. I didn't know any of them.

Mr. Schumacher: And did you tell the law enforcement officers that?

Nicole Stevens: Yes, I did. I said, unfortunately, none of them look familiar.

Mr. Schumacher: And, what was their response, if any?

Nicole Stevens: Nothing. The left the office and then called me again and asked if they could bring another lineup out.

.

.

.

Mr. Schumacher: How much time elapses between the first time that they are out and the second time?

Nicole Stevens: It was within an hour.

.

.

.

Mr. Schumacher: And what kind of a lineup are you shown this time around?

Nicole Stevens: The same type, six pictures.

Mr. Schumacher: Were there any pictures that you recognized to be a duplicated one from the first lineup and the second lineup?

Nicole Stevens: No. I didn't notice that.

.

.

.

Mr. Schumacher: Okay. And when you made the identification in the second lineup, is that something you just point right at him and say –

Nicole Stevens: I identified – I automatically picked him out.

(DE 128:78-83).

11

Stevens testified that after identifying one the photos in the second photographic

lineup, as the person she had observed in the complex, she signed the photograph.

> Mr. Schumacher:  So when did the officers tell you about Mr.
> Garcon being in both photographic arrays?
> Before or after you actually signed it?
>
> Nicole Stevens:  After.

(DE 128:84).

Stevens stated that the officers informed her after she identified the Defendant in the

second photographic lineup, that a photograph of the Defendant, depicting him younger and

thinner, was contained in the first photographic lineup.(DE 128:83). Stevens explained that

when she was asked by defense counsel at the November 8, 2007 hearing, if there was

anyone in the "first lineup in the second lineup" and she said "[y]es" that:

> "I think I just – answered different because at that time I did not
> know that. I was told after I identified him on the second lineup that
> he was also in the first lineup."

(DE 128:82). Stevens testified that the first and second photographic lineups were not

presented next to each other.

Stevens could not recall the details of the description she gave to law enforcement of

the individual she suspected of residing in Apartment 5213.  Stevens testified that she

remembered telling the police that the individual was an "African-American male" who wore

a hat and may wear his hair in "dreads." Stevens testified that she had "face to face" contact

with the Defendant when he paid the rent. Stevens stated that the Defendant paid the rent,

each month, for approximately 9 months, in person at the management office.  Stevens also

noticed that the Defendant had an "aroma of marijuana" when he came into the management

office to pay rent. Stevens confirmed that she also had "face to face" contact with the

Defendant when he identified himself as Shari Morant's brother and picked up the keys to

Apartment 5213. Additionally, Stevens stated that she observed the Defendant as he drove around the community. Stevens confirmed that her attention was drawn to the Defendant's vehicle because of the "amount of smoke coming from it" referring to marijuana.

Stevens made an in-court identification of the Defendant at the December 13, 2007 hearing. When asked by the Government if she was able to recognize anyone as the individual she suspected residing in Apartment 5213, who paid the rent monthly by money order, and to whom she had released the keys to Apartment 5213, Stevens identified the Defendant and said "[h]e's right there in the blue and white with the black hair." Defense counsel asked Stevens if she felt "compelled to identify him [the Defendant] again at the suppression hearing" since she had already identified "that person?" Stevens responded "[i]t doesn't matter. I mean, I can tell you who he is. I know that's him." (DE 128:103).

Agent Van Reeth

Agent Van Reeth testified that Stevens provided a description of the individual she suspected of residing in Apartment 5213 on December 12, 2007. Van Reeth testified that his notes, made contemporaneously with Stevens statements, reflect that Stevens described the individual as: African American, male, 5'6" - 5'8", medium build, short hair, wore a hat, dark colored - dark complected, thick - that is he appeared not be out of shape. Van Reeth testified that Stevens did not mention facial hair, and that if Stevens said dredlocks "I would have wrote that down."

Van Reeth confirmed Birch's testimony concerning the procedure used for the photographic lineup, the circumstances attendant to the photographic lineup, and that only 1 photographic lineup was ever shown to Stevens.

Discussion

In the present case, there are two issues before the Court: (1) whether the out-of-court

identification of the Defendant by Nicole Stevens violates the Defendant's Constitutional right to due process because the identification procedure was "unduly suggestive" and under the totality of circumstances it created a substantial risk of "irreparable misidentification" of the Defendant; and (2) whether Nicole Stevens' out-of-court identification of the Defendant tainted Stevens' in-court identification of the Defendant, and, therefore, should be suppressed.

### Stevens' Out-Of-Court Identification

"To violate due process, an identification procedure used by the police must be unnecessarily suggestive and create a substantial risk of misidentification." Johnson v. Dugger, 817 F.2d 726, 729 (11th Cir. 1987)(citing Neil v. Biggers, 409 U.S. 188 (1972)). In Biggers, the Supreme Court observed that it is 'the likelihood of misidentification which violates a defendant's right to due process." Neil v. Biggers, 409 at 198. Unnecessary suggestiveness alone does not require the exclusion of out-of-court identifications. Id.

In assessing the constitutionality of an identification procedure Eleventh Circuit precedent requires a two-step analysis. Cikora v. Dugger, 840 F.2d 893, 895 (11th Cir. 1988). The first step is to determine if the identification procedures used were unduly suggestive. Williams v. Weldon, 826 F.2d 1018, 1021 (11th Cir. 1987). "If not, that ends the inquiry." Id. If the original identification was unduly suggestive, step two requires a totality of circumstances analysis to determine if the identification was nonetheless reliable. Neil v. Biggers, 409 U.S. at 199. Factors to be considered in the totality of circumstances test are: (1) the opportunity of the witness to view the alleged criminal; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. Id. at 199-200. "Reliability is the linchpin in determining the

admissibility of identification testimony." Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

The crucial test of suggestiveness is whether the lineup suggests which individual the witness should identify, thereby creating a likelihood of misidentification. Neil v. Biggers, 409 U.S. at 198. In assessing suggestiveness, the conduct of government agents which tends to focus the witness' attention on a particular individual is a consideration. United States v. Field, 625 F.2d 862, 867 (9th Cir. 1980). A photographic lineup is unduly suggestive, when the defendant's photo significantly stands out from the rest of the photos in the array. O"Brien v. Wainwright, 738 F.2d 1139, 1141 (11th Cir. 1988)(holding that a photographic lineup was unduly suggestive when the defendant's photo was a color print while all the other photos were black-and-white mug shots causing the defendant's photo to stick out "like a sore thumb;" Cikora v. Dugger, 840 F.2d at 897-898(finding that a photographic lineup was not unduly suggestive even though the defendant's photo was the only photo with height markings, and three of the other photos depicted men of a different race than the defendant); United States v. Ricks, 817 F.2d 692, 697 (11th Cir. 1987)(holding that a photographic line up was not unduly suggestive even though the defendant was the only individual depicted in the array wearing eyeglasses); Williams v. Weldon, 826 F.2d 1018, 1021 (11th Cir. 1987)(holding that a photographic lineup was not unduly suggestive because the defendant was the only black man in the array); United States v. Maguire, 918 F.2d 254, 263 (1 Cir. 1990)(finding that two different photo arrays which used the same exact photo of the suspect, did not rise to a constitutional violation). In the present case, the government argues that as a threshold issue the Court must determine if one or two photographic lineups were shown to Stevens by Agents Birch and Van Reeth. The Court disagrees. The issue before the Court is whether or not the identification of the Defendant by Stevens was caused by an unduly suggestive procedure so as to create a substantial risk of misidentification. Neil v.

Biggers, 409 at 198.    The test for suppressing an identification is not whether law enforcement's conduct attendant to the identification process warrants suppression of the identification. See Manson v. Brathwaite, 432 U.S. 98 (1977). Reliability is the linchpin in determining the admissibility of identification testimony. Manson, 432 U.S. at 106. A suggestive identification procedure does not violate due process so long as the identification process possesses sufficient aspects of reliability. Id.

In the present case, Ms. Stevens presented compelling testimony in support of her belief that she was shown 2 photographic lineups by the police. The Court finds Stevens' testimony credible as to all aspects of the identification procedure.   The credibility and consistency of Stevens' testimony is enhanced by the certainness with which she expresses her conviction that the Defendant is the person whom she believes resided in Apartment 5213.   Stevens remains resolute that she was shown 2 photographic lineups despite challenge by the Government.   Stevens' testimony demonstrates the very "linchpin" of reliability necessary for a constitutionally admissible identification. Id. Therefore, the Court assumes without finding, solely for the purpose of the instant Motion, that 2 photographic lineups were presented to Stevens by law enforcement. Testimony concerning the issue of 1 or 2 photographic lineups, is included herein, only for its relevance as to undue suggestiveness in the identification process, and, to demonstrate the reliability of Stevens' identification.

Undue Suggestiveness

The Court finds that Stevens' out-of-court identification of the Defendant was not the product of an "unnecessarily suggestive" procedure and did not create a "substantial risk of misidentification." Williams v. Weldon, 826 F.2d at 1021. Here, the Defendant has failed to meet his burden of proof and persuasion to establish that the police procedures used were

16

impermissibly suggestive. <u>Cikora v. Dugger</u>, 840 F.2d at 1021. The Defendant's argument that Stevens' identification of him from a second photographic lineup was tainted as a result of Stevens' viewing of the first photographic lineup fails for the following reasons:

First, Stevens testified credibly that she had no knowledge that the Defendant's photograph was in the first array. Stevens testified that it was only after she had identified the Defendant in the second photographic lineup that she was told by the police that the Defendant's photo was in the first photographic lineup. Stevens testified that after she identified the Defendant, and signed and dated the photographic lineup, that Birch told her that a photo of the Defendant, depicting him as younger and thinner, was in the first photographic lineup.

Second, Stevens testified credibly that she "automatically" selected the Defendant's photograph out of the six photographs presented in the second photographic lineup. Birch corroborated Stevens testimony, stating that Stevens "immediately pointed at the picture" of the Defendant. The Defendant failed to demonstrate that there was anything impermissibly suggestive about the way in which Birch and Van Reeth presented either the first or the second photographic lineup to Steven. Stevens credibly testified that she was not shown the two photographic lineups next to each other. Stevens testified that before being shown the photographic lineup that the officers told her "what you always say before you get shown a lineup. I can't remember the wording of it, but . . . ."        Birch testified that Stevens was instructed to take her time viewing the lineup. Stevens testified that she gave the process "her full attention."

Lastly, Stevens credibly testified that there was nothing unduly suggestive about the photographic lineups. Stevens did not state that there was anything remarkable about the first or second photographic lineup that drew her attention, or made the Defendant stick out like

a "sore thumb." Neil v. Biggers, 409 U.S. at 198; O"Brien v. Wainwright, 738 F.2d at 1141.
To the contrary, Stevens testified that the first and second photographic lineup were the same
in style and size. Stevens stated that the first photographic lineup "was 6 pictures on a piece
of paper." Stevens stated that the second photographic lineup "was the same" - 6 pictures
on a piece of paper. The Government demonstrated that the second photographic lineup,
prepared by Detective Lefont, was not unduly suggestive. The second photographic lineup
contains 6 photographs with similar color backgrounds. It contains a recent photo of the
Defendant and 5 photos of other black males of approximately the same age with similar
facial characteristics. Stevens' testimony is unfaltering that the only thing distinctive about
the first photographic lineup was that she "didn't know any of them."

Totality of Circumstances

        Assuming, arguendo, that the procedure used by law enforcement for the photographic
lineup identification was impermissibly suggestive, Stevens' out-of-court identification is
reliable under the 5-part Biggers totality of circumstance test, and, does not create a
substantial risk of misidentification. Neil v. Biggers, 409 U.S. at 199-200.

        (1).    The Opportunity to View[6]

        Stevens had considerable opportunity to view the Defendant prior to her out-of-court
identification of him. Stevens opportunity to view the Defendant spans a nine-month period
and includes multiple, face to face, exchanges between the two. Stevens met with the
Defendant when he picked up the keys and gate card for Apartment 5213. Stevens saw the
Defendant each month when he came into the management office to pay rent. Stevens

---

        [6] Stevens' testimony at the November 8, 2007 suppression hearing, demonstrating
the Defendant's presence in the Royal St. George apartment complex as an unauthorized
tenant of Apartment 5213, was relied upon by the Defendant to establish standing to
contest the search of Apartment 5213 in his effort to suppress physical evidence in this
case. (DE 102).

testified that she also saw the Defendant driving around the community.

The Defendant suggests in his Motion, that Stevens' identification of him was unreliable because Stevens "had not engaged him in conversation" when he dropped off the rent and she had "never approached him." Defendant's allegations concerning Stevens' opportunity to view him are disingenuous. The Defendant testified at the November 13, 2007 hearing that he met and talked with Stevens. Specifically, the Defendant stated that when he went to pick up the keys to Apartment 5213 that "I instructed Nicole that upon moving out, that I would return the gate key and the garage opener just like I received them." (DE 116:61). Additionally, the Defendant testified that he talked to Stevens in December 2005 to inform her that Morant had changed her mind and was not moving out of Apartment 5213. (DE 116:67). The Defendant testified that this face-to-face conversation with Stevens occurred when he went into the management office to pay the December rent. (DE 116:82). The Court finds that the frequent, multiple interactions between the Defendant and Stevens create a strong indicia that Stevens identification of the Defendant is reliable. Neil v. Biggers, 409 at 194.

(2). The Degree of Attention

The Defendant attracted Stevens' attention because she suspected that he was residing in Apartment 5213 as an unauthorized tenant. At the November 8, 2007 evidentiary hearing, Stevens articulated her concerns regarding the Defendant's presence in the apartment complex. Stevens credibly testified that her concern rose to the level of taking action. Stevens called the tenant of record to inquire if any unauthorized persons were residing in the apartment - and she had never done that before. (DE 102:75). Stevens reported her suspicions about the Defendant to her boss. Plus, Stevens continued to observe the Defendant as he drove around the community. Additionally, the Defendant sparked Stevens' attention because he frequently smelled like marijuana when he paid the rent. The

19

Court finds that Stevens' degree of attention, as to her observations of the Defendant, is considerable and her identification of him reliable. Id.

    (3).   The Accuracy of Description

At the December 13, 2007 hearing all that Stevens could recall of the description she gave to police of the Defendant, following the search of Apartment 5213, was that he is an "African American male" who "sometimes wore a hat." Agent Van Reeth testified credibly that his notes, made contemporaneously with Stevens statements, reflect that Stevens described the individual whom she suspected as residing in Apartment 5213, as a black male, between 5'6" - 5'8" in height, medium build, short hair, wore a hat, dark colored - dark complected, thick - that is he appeared not be out of shape. The Court finds that this description is generally accurate as to how the Defendant appeared in Court.[7]

    (4).   The Level of Certainty

Stevens credibly testified that she "automatically picked out" the Defendant from the second photographic lineup. Birch stated that Stevens "immediately pointed at the picture" of the Defendant. Stevens wrote her name, the date and time on the picture she identified from the second photographic lineup. Stevens' level of certainty as to her identification of the Defendant in the second photographic array has been steadfast and unwavering. The Court finds that Stevens expressed a significant level of certainty as to her identification of the Defendant.

    (5).   The Length of Time

On December 14, 2005, Stevens identified the Defendant's photograph as depicted in the second photographic lineup presented by police. At the November 8, 2007 hearing,

_____

[7] The Defendant is a black male. It appears that the Defendant is dark-complected. The Defendant appears fit and not out of shape. The Defendant appears to be of medium build, but, may be better described as medium-large. The Defendant is actually 5'9".

20

Stevens testified that the last time she had seen the Defendant in the apartment complex was a few days prior to December 12, 2005. (DE 102:89) At the November 13, 2007 hearing the Defendant testified that he had face-to-face contact with Stevens and talked to Stevens, when he turned in the December rent. (DE 116:67,82). The Court finds that the length of time between Stevens' last observation of the Defendant, and her out-of-court identification of the Defendant, a few days, demonstrates the reliability of Stevens' identification.

The Court finds Stevens' out-of-court identification of the Defendant "reliable."  The Court finds that the identification was not "unnecessarily suggestive" and did not create a "substantial risk of misindentification." Williams v. Weldon, 826 F.2d at 1021. Additionally, even if the procedure was impermissibly suggestive, the Court finds that applying the factors in the totality of circumstances test from Neil v. Biggers, the reliability of Stevens' identification outweighs Defendant's claim of improper suggestiveness.  Neil v. Biggers, 409 U.S. at 199. The Court finds that the Defendant's constitutional Due Process rights were not violated as the identification procedure used was not impermissibly suggestive and based on the totality of circumstances Stevens made a reliable out-of-court identification of the Defendant. Neil v. Biggers, 409 U.S. 199-200.

### In-Court Identification

The standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification is whether there is a substantial likelihood of irreparable misidentification. Neil v. Biggers, 409 U.S. at 198. Here, the Court has found that the identification procedure used for the out-of-court identification was not impermissibly suggestive, and, even if the identification procedure was impermissibly suggestive, Stevens' identification is reliable under the totality of circumstances test.

In the present case, Stevens' in-court identification of the Defendant at the November

21

8, 2007, and, December 13, 2007 hearings is affirmative and certain. Here, the Defendant and Stevens maintained continuous, on-going visibility to each other during the time that the Defendant is alleged to have resided at Apartment 5213. Stevens described her certainty as to her identification of the Defendant at the December 13, 2007 hearing "[i]t doesn't matter. I mean I can tell you who he is. I know that's him."

Recommendation

For the reasons stated above, this Court recommends to the District Court that the Defendant's Motion to Suppress and Otherwise Exclude From Evidence Eyewitness Identification (DE 107), filed November 26, 2007, respectively be DENIED.

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable United States District Judge Daniel T. K. Hurley, within ten (10) days after being served with a copy. See 28 U.S.C. § 636(b)(1)(C). Failure to file timely objections may limit the scope of appellate review of factual findings contained herein. See United States v. Warren, 687 F.2d 347, 348 (11th Cir. 1982) cert. denied, 460 U.S. 1087 (1983).

DONE and SUBMITTED in Chambers at West Palm Beach in the Southern District of Florida, this ___15___ day of January, 2008.

ANN E. VITUNAC
UNITED STATES MAGISTRATE JUDGE

Copies to:
Honorable Daniel T.K. Hurley
AUSA William Zloch
Howard Schumacher